White. All that remains of this police case is a single excessive force claim against Sergeant White. This is an incident that lasted only six minutes and Sergeant White did not use any force for the first three minutes. Summary judgment was warranted relying solely on the uncontradicted evidence that Sergeant White responded to a 9-1-1 call and two encounters followed. The first encounter while Sergeant White was standing with Justin Scott, Justin Scott ignored repeated verbal commands, specifically five commands to drop or put down the unidentified metal object in his right hand, three commands to put his hands behind his back and declined to answer three questions about weapons. Only as Sergeant Scott reached for Justin Scott's right arm did he then say he had no questions, no weapons. Sergeant White saw his arm coming up. This is something that the district court considers a genuinely disputed fact. I rely on the video where you can see his hand by his thigh until the moment he is struck and you see his hand at his waist and his admission as well that he was moving his arm but he was just moving his arm while answering questions. But even based on the evidence as viewed by the court, you can clearly see the shine of the metal object reflecting in the sun. You will see on the video a white light. It is when Sergeant White saw that light that he then responded to an immediate threat with a forearm strike to the back of the neck. My difficulty is, and where am I wrong in doing this, admittedly it's a single police officer responding to a 9-1-1. He gets there and he sees a pedestrian, a citizen that doesn't fit the description of the burglar and that citizen just does not want to speak to the police officer. But he's holding, say, a flashlight, a metal flashlight. Can a police officer use the brachial stun to the citizen who just doesn't want to be involved because he happens to have a metal flashlight? Considering the totality of the circumstances, what Sergeant was looking at was he did respond to a 9-1-1 call. But he had, the district court made a factual finding that he had no reasonable suspicion as to Scott of any crime. That's correct. That is one of the fact disputes that the court found was genuine, that he was not reasonably suspected of a burglary. But he did not use that force. So that's my question. Why don't applying Goodson, that old Fifth Circuit case, both parties discuss it, if you don't have reasonable suspicion of any crime, then no cop, no policeman can just stun the person because they aren't answering. More recently, this court in Cadena in 2018, following Frayer versus City of Arlington in 1992, said you did not have to be suspected of any crime. Simply pose an immediate threat. Now, all the sergeant was doing was trying to investigate a 9-1-1 call. He could have, as you suggested Judge Higginson, just let it go and might have. But at that moment, when he saw the light shine and in his perception that arm coming up, he believed he was about to get sucker punched on the proposition that a police officer encountering a citizen that there is no reasonable suspicion as to if the citizen just wants to walk away, not answer questions. If they're holding something metal, the police officer therefore is reasonable when they stun them to the ground. Is that the position? Your Honor, I believe you're missing a step there, and that was the false arrest claim, which we've already succeeded on. And that is he was had reasonable suspicion simply to detain him and investigate. He's simply trying to investigate a 9-1-1 call in a high crime area where this sergeant himself recently came upon a burglary in progress and made an arrest. All he was doing was investigating. But you can't knock people down to the ground who happen to be in the area you're investigating because they don't want to be involved. I don't dispute that at all, Your Honor. You accept that? I do accept that. Isn't that essentially the holding of Goodson? That is not what happened in this case. In this case, only when you can see on the video the shine of the metal object in his arm hand, which is unidentified, it is only after he sees that that he uses a single forearm strike, which a brachial stun. Your best authority for, again, so a police officer wants to start speaking to someone who doesn't want to speak to them, who there is no reasonable suspicion as to involvement in a crime, if approaching them when that citizen is passive, the officer then also sees something metal, you're saying it's even contested law? It makes it reasonable to stun them to the ground? To use the minimum amount of force to defend himself. Defend himself? Yes, Your Honor. I have to re-read Cadena and Rockwell. I'm sure they're in your briefs. The cases I saw in your briefs were Orr v. Copeland, Mazok, Poole v. Shreveport, and Griggs. Am I right that all those cases, if those are the ones you cited in your principal brief and reply, all those cases there was either PC or reasonable suspicion, then the force ensues. So do you hear my question? Are the cases that I described that I took from your brief, did they all involve reasonable suspicion as to the individual that then is non-compliant? Again, Your Honor, reasonable suspicion goes to the false arrest claim, which is not before you. This is only the excessive force claim, whether or not he perceived an immediate threat to his safety. The district court was applying the Graham factors. One of them is, what's the offense? If the person committed no offense, neither probable cause nor even suspicion, I just don't see how force can ever be used against them, because they happen to be holding something metal. In Rockwell in 2011, this court said that not all the Graham factors need to be present. Rockwell 2011, that is in your brief. I missed it? I'm not sure if it's in my brief or not, Your Honor. It's in my notes. I do not, it doesn't help me when lawyers, now it may be there, but it really doesn't help me when lawyers come up with authority that isn't. I asked you questions about the authority you cited. It is in my brief, Your Honor. Rockwell v. Brown in 2011. I apologize. 2011. And that stands for the proposition. You can still, policemen can use force, subdue a citizen to the ground because are they being aggressive or there's a perceived threat, a perceived threat at the moment of the threat. And I don't believe it can be said that no reasonable officer would perceive a threat when a suspect has an unidentified metal object that he refuses to drop or respond about the metal object. And the officer sees a shine of light coming off the metal object. I don't believe it can be said under qualified immunity analysis. My problem with that though, and I speak affirmatively, it's my mistake that I missed your case. So I'm apologizing for that. But it would seem to apply that policemen then could stun to the ground anyone carrying a cell phone. They have no involvement of the crime. Cop says, I want to talk to you. Oh, cell phone knocked to the ground. How is that different? Because that that could threaten me. We're standing near each other. You could whack me with the metal object because you consider the totality of circumstances, not the cell phone in isolation. You consider all of the factors that a reasonable officer is evaluating at the time that they respond to a 911 call. The person's just standing there. They aren't running. There's no there's no flight. Well, not belligerent. They're just the guy just didn't want to answer the policeman's questions. Your Honor, he did answer the policeman's questions initially until he stopped answering when when he admitted what he had previous arrest. He stopped answering when he had asked what was he arrested for? At this point, it's already been found under the false arrest claim that Sergeant White had was entitled to frisk him. That's all it is. A Terry stop and a frisk just for weapons. My legal question. If the district made a finding that there was no reasonable suspicion, you're saying that's clearly erroneous. Your Honor, even if it's debatable under Goodson, at least you get to the jury, then it gets to make this assessment, right? He said there was no reasonable suspicion of a burglary, but he dismissed the false arrest claim because we prevailed on that claim. He was entitled to detain him and simply to frisk him. When I read that order, it'll say there was no reasonable suspicion of burglary. I thought he said there was no reasonable suspicion of any crime. That's that's correct. You said of burglary. Is it no reasonable suspicion period? I believe he said both. Okay, well, at that point, at that point, how can you possibly prevail with qualified immunity applying Goodson again? Your Honor? Because Rockwell says it's at the moment of the threat. I have obviously have to read Rockwell, but I'd like you to speak to Goodson because that's earlier published authority. Your Honor, I would defer to your analysis of that case. My analysis. What's your analysis? It's not before me, Your Honor. I apologize. I was relying on more recent case law that I thought was more applicable here. For example, well, I've given that example, which is cadena and also Griggs Griggs in 2016 Grigsby Brewer. This court said whether a reasonable officer would perceive. Now, the totality of the circumstances is not just one thing in isolation. It is the fact that he asked him three times whether he had any weapons and he would not answer. All he wanted to do at that point was frisk the outer clothing, which he's entitled to do simply to investigate this 911 call. But as he reached for his arm, it was only at that point that he said, I have no weapons. Keep in mind, Your Honor, that there's no injury from the brachial scum. There must be an injury to meet the first element of an excessive force claim. They've made no. They ignore that completely. The district court also ignored the fact that a brachial stun is designed to give no injury. It's only designed to stun the nerve to gain pretty perceptive. It's in a footnote, but the district court said there's some disharmony in Fifth Circuit law, tracing back to Brooks, which you probably know I wrote. And I think the district court's right. The language that I used in Brooks is inconsistent with earlier binding law that if even minimum force can be excessive, if even a minimum injury can lead to an excessive force claim, if the force has no connection. To what happened, right? But the only injury that district court address was the abrasion and contusion, which was diagnosed by the hospital, which was on the face. There is no injury to the neck. A brachial stun does not cause injury. It's not intended to. That's why officers use it. It's only injury was it knocked him to the ground. It was a control takedown. There's no dispute about that. He didn't just fall to the ground and he didn't fall on his face. That abrasion and contusion, which I would still assert is de minimis. That abrasion and contusion is from the ground fight. So there are two separate encounters here, which is how this court analyzes a lengthy struggle, as you did in Griggs. The first encounter was standing. The single blow then was the forearm strike to the neck, which caused no injury. I think you have to separate that out from the second encounter. Griggs didn't reiterate a de minimis, no excessive force though, right? It did not. But it does show that there are two separate encounters. Now, going to the ground fight, which is completely separate, there is no dispute that Sergeant White was tased. He was disarmed into his taser. Now, the district court found there was a reasonable, a genuine dispute as to whether or not Mr. Scott had the taser and Mr. Scott tased him. But that's not the inquiry. The inquiry was whether a reasonable officer would perceive. That's what you emphasized in Griggs. The inquiry is not whether he was actually resisting. The same is true in Orr in 2012, where that plaintiff also denied reaching for the gun. And this court said that is not the inquiry. Would a reasonable officer believe? It's undisputed that Sergeant White was disarmed of his taser and was tased. At that point, you will find most of the case law officers use deadly force, and he was entitled to do so. The district court focused on the fact that Sergeant White said, Apologies. I was punching the shit out of him. But if you listen to the entire sentence on the tape, I was punching the shit out of him to avoid shooting him because he had my taser and he tased me. So this is, the district court did not have the proper focus. We start with reasonable uses of force, then it becomes unreasonable. The person's handcuffed already, they've restrained him fully more. Do you know of a case that starts unreasonable force at the outset, first encounter, but then because of the violent resistance, there might be qualified immunity as to the second portion? Do you have a case that is in that reverse order? I believe that's the case in Westfall, Your Honor, but I'm not certain. But I believe Westfall, which is what we rely on for the de minimis injury, sets that forth. Basically, I have three seconds. I think I'll save them for rebuttal. Thank you, Judge. Good morning, Mayors of the District Court. Daphne Silverman for Mr. Scott. I have Norm Silverman, my law partner and husband, with me today. I think it's pretty clear that there actually are controversial facts in this case and, of course, you have a limited ability at interlocutory appeal to look only at the legal issues, which I had believed was going to be the Westfall issue, which is a little interesting with Judge Graves being on Westfall and you being on SAM and having written the language that you actually just called out there, that the de minimis injury, you have to look at actually the force used at the same time you're looking at the injury. That's the earlier proceeding published. If I miswrote something in Brooks, the profanity case, you agree that our court has, prior to that, been quite clear that the two are interrelated? Yes, and I actually didn't read the Westfall decision that Judge Graves was on as being in conflict. Brooks has some loose language. I understand where you're going from in Brooks. You're saying here is a fact pattern that, in this case, we found is de minimis. I didn't really even read Brooks. I'm top lawyers. You guys can be tough back on me. No, I'm hoping you're going to clarify it. That's good. The brief had a lot on de minimis as to the first encounter, but in oral argument, the focus has been on what I think is the tougher issue. It seems indisputable that this was a 9-11 call, single police officer responding to the area, and then approaches a citizen, your client. And then there is noncompliance, whatever we want to call it legally, passive resistance. And then when they're very close to each other, the police officer clearly sees whatever it is, a metal hubcap. Here's the question. If there is reasonable suspicion of a crime, would you agree it would be then, if the individual who's about to be frisked is holding something metal, a cop can't frisk them if they've got the metal object, they would have to do something abrupt to subdue them, if there's reasonable suspicion? So I would say that that's a fact issue for the jury to be determined. You'd say whether there was reasonable suspicion is a fact issue? Whether there was reasonable suspicion and whether there was a reason to believe that he was a threat is also a fact issue. And in this particular case, actually, Officer White, until right at the last minute, only said in his interview, which we cited in our brief, in his interview, he said it was a little metal object that he was fidgeting with that he thought was a hubcap. He never indicated that he was concerned about it, fearful of it, or in any way thought that it was a threat to his safety. But in the video, when he grabs the left arm, there's no way he could frisk him for weapons with the free right arm containing anything metal. It would just be feet away from a blow. Oh, I... Right? The citizen would probably have to drop if... I'm trying to shoehorn this into Goodson is how I've analyzed it, but that may not be right. Yeah, I don't think so, because when we're talking about a little metal hubcap, we're talking about something more like the size of a quarter. Does a citizen have to drop all of their money, their watch, everything, just when they're being frisked? Which, again... Actually, let me back up on that, too. I think the city's actually confused. They think that because the false arrest claim is dismissed, that you don't address probable cause or reasonable suspicion on the excessive force claim. That's not true. It's one of the grand factors, regardless of whether the false arrest claim is dismissed. The false arrest claim is not dismissed by any determination that there was no reasonable suspicion, or that there was reasonable suspicion, or probable cause. It's dismissed on the independent intermediary doctrine, which we might be back up here talking about again if we go to trial and come back. Do you know the size of this metal object? A tiny little hubcap-type thing, something that... Just like what the officer was saying, a little hubcap that he's fidgeting with like this. Is the hubcap for a toy? Probably for a toy. It's not going to be for a vehicle, or a little spinner-type thing. Are you talking about an inch in diameter? Two inches? Oh, yes. Yes. Tiny little thing that he's just doing like this with. Mr. Scott is clearly mentally ill. Why are people talking about hubcaps then? That has an image of me of a big thing. No. Yes. It's a little toy thing. Why are you agreeing with the characterization that it was a hubcap? Because it was a little toy hubcap-type thing. Is it? Okay. It's in the statement. When Officer White... I guess what I'm saying is the dimensions are important. I've watched the video, and clearly he had his hand down, but I couldn't see what was in it. Officer was closer. I'm giving him the benefit of the doubt. He saw something. I don't know how soon he saw it, and I still didn't hear how soon he saw it, except that he saw it when the arm was raised. Maybe he saw nothing before that, but it helps me to hear how big it was. So do you know? Was it one inch in diameter? Was it two inches in diameter? About the size of something you can hold, just like that. Two inches for purposes of record. You're making about a half dollar. Exactly. It's a little toy he's holding. Actually, Officer White says in his interview with the officer at the scene that he can see it ahead of time, that he's holding this little something and fidgeting with it. That's actually part of how he knows that Mr. Scott is mentally ill. Although people can fidget that aren't mentally ill, this is not someone like in Tarver that they couldn't see his mental illness. You can't engage Mr. Scott and not recognize that he has a mental illness. Our passive resistant case law so often intersects with mental illness, but therefore, we are asking police officers in a split second facing a deranged or deeply troubled person to perceive the distance difference between non-compliance and something that requires to protect the officer himself. So the case I'm thinking of that is the hardest to distinguish, I think, is the Carroll case, right? In the end, the individual who did own his home ends up getting killed because he's refusing to agree. He's making all sorts of nervous gestures and the force just accelerates to death. And yet our court granted qualified immunity. In this case, because the entire thing's on video, you can see that there's none of that type behavior of really refusing. The only thing he refuses to do is answer what he was arrested for. And that is not sufficient. This is not a fast evolving, escalating circumstance. You can see how peaceful, how calm Justin is. And I would say this is facts too. This is all fact specific stuff that Judge Pittman has already found. And actually, the trial judge had found the same thing. The trial criminal judge had dismissed it. I guess I have a couple of questions in light of what happened. And I don't know if it's connected to the case law or not, but let me ask it. So the first one is, what should the officer have done in face of the refusal to respond to his questions? And then I guess the next question is, what was he entitled to do? And is that connected to reasonable suspicion? What he should have done when he found out that Mr. Scott had recently, was recently experiencing homelessness and was attempting to get to the arch, which is our facility in the city of Austin for supporting the homeless, was offered to take him to the arch where he was trying to get to. That's what he should have done, in all honesty. That's what society is wanting the police to do if someone is. So now what was he entitled to know? And was that tied to reasonable suspicion? Yes, it's tied to reasonable suspicion. He was entitled to know nothing at that point because Mr. Scott was not suspected of anything. The call didn't report anyone suspected of a crime. The 911 call that he's reporting to is merely reporting a walking through their neighborhood and with their things, but doesn't report that that person is near a fence, committing a crime, any of those things. All those things are disputed. Virtually everything that the city attorney says is uncontroverted, is converted, controverted. And I'll be, you know, try to set that out in our brief, the different things. The issue of reasonable suspicion is controverted? Yes. I thought the district court itself said there was no reasonable suspicion. Oh yes, I'm sorry. We can, we, we, um, controvert the reasonable suspicion. We do not believe there was reasonable suspicion to approach him at all. And Judge Pittman correctly finds that, um, and as did the... On these, the two cases that I hadn't sufficiently prepared, the proposition is that our circuit has said, in Cardena and Rockwell, that police officers can still use subduing force even when there's no reasonable suspicion against a citizen, if the officer feels threatened. Yes. Do those cases stand for that proposition? And if so, why isn't that what happened here? I think those cases stand for that proposition. I think that that, that, that if the officer perceives the threat and his, and his perception is reasonable and objectively reasonable, then, um, then it, then those cases are in line with Graham and the cases that talk about the factors on excessive force. That is not the case here. Judge Pittman found, as did the prior trial judge, that there was no reasonable suspicion to believe that he was committing a crime and nothing objectionable, objectively reasonable to believe that any force could be used whatsoever. Okay. But put aside reasonable suspicion of a crime. Do those cases say when a policeman chooses to go up to a citizen to ask questions, if upon approaching the citizen, now they've put themselves in a place where they feel endangered, they can use force, that's reasonable. You know, wording it that way about the police, I would have to go back and look at it in that manner. I guess, different question, you heard me ask at the end of their argument. Let's assume you win, you prevail, no qualified immunity for the first use of force, the break you'll stun. We don't accept the de minimis, problematic law, it's not controlling, and then as to the Graham factors, the district court made its determination, at least there's a dispute of fact. But, once they're on the ground struggling on top of each other, can it then, would we compartmentalize and say, as to that portion of the encounter, there's qualified immunity, because clearly the individual is violently resisting. Call it protective, defensive, you just got to struggle on the ground. So, one, I would say that's a factual dispute that shouldn't be reviewed at interlocutory level, that the judge, Judge Pittman, has made a finding on that, that there's, what you can review now. Right, but I'm saying, if the video suggests to me violent resistance, and yet it came about because of an improper use of force, is there a law that says that we would fracture up the full encounter and say, well, he has immunity once the arrestee starts fighting back and the weapons are near each other? Westfall definitely fractures two different sections of the case. And starts out with an unreasonable use of force, and then? And then, I believe that Westfall's first one is unreasonable. But, regardless of that, actually, I mean, I would disagree with your opinion of the video. I don't think that the video finds, is violent at all. And, our expert who looked at the case, a law enforcement officer, and that testimony is what Judge Pittman quotes in his opinion, indicated that all that Judge, Mr. Scott was doing was defending himself, if anything. He's right, and there's actually two things that are happening, as Mr. Scott explained, when I was tasered, that makes your body convulse, and I was moving about without any control over my body. That's one of the problems that, of what you're seeing, is he's convulsing, because not just is this a far taser, it's a taser right on him, and the barbs are in his chest. That's part of the injury that's shown in the medical records, that are in the record, contrary to what the city says, the judge can look at all of the record, and that's what he did. The barbs are in his chest, and pulled out. That was causing him to convulse. So much so, no, no, no. What happens is, he grabs Officer White's arm, and because this taser is so powerful, going through him, out his arm, into Officer White. That's our position of the facts, and that's the best I can see on the video, that's the best he can recall. He is, you know, obviously in extreme pain, but at the time he's doing that. The officer says, because I thought I heard him say on the video, I thought I heard him say he has my taser. Yes, he did say that. I think that was disingenuous. He was just wrong. He was disingenuous, I believe. I don't think he was wrong. I think he knew the answer to that question. I think at this point, he's starting to protect himself, and that'll be arguments for the jury, fact arguments, to protect himself from liability. Why is this case different than Griggs? Griggs is the most recent one, and it's in the briefs, it's described as quite in tension with Hanks. With, I mean, different in... Well, in Griggs, ultimately, our court said qualified immunity as to this. Again, it's one of these passive resistance cases, police officers trying to get information from somebody, person's non-compliant, and what ends up happening is the non-compliance is perceived as a threat, and then there's a struggle, and there's injury. You're back again to the perception of threat. Both Judge Pittman and actually the criminal trial judge both found that when they looked at all of these facts, that there was, in fact, no reason to perceive a threat in Mr. Scott. So that's a factual determination, that's a weighing of the evidence that they were entitled to make, that at this interlocutory level, this court's not entitled to make, may get to do it later if we're back up here, but that's not for this level. And I think our expert also clarified that all of his moves were defensive, in her view, in her analysis of the way the incident went down, defensive or related to his medical condition. And I mean, I think it sounds like you've gotten, you all have already resolved what I didn't think was a conflict, but what the city thought was a conflict, and I have to admit, the law clerk that helps me brief, she's like, oh, I see what the city's saying. So the city wasn't the only one that saw it that way, but I did not read it as a conflict. The one thing on the de minimis injury I want to make sure is that it's also distinguishable from Westfall. Our injuries are far greater than the Westfall injuries were, and those are set out in medical records. Judge Pittman quotes them, in particular, the barb and the ribs. He explains he has difficulty with vision. I haven't had difficulty with the de minimis injury, and it isn't their emphasis now. But when you made the pragmatic response to Judge Graves's question, it doesn't really seem realistic he would stop a burglary 911 inquiry to take the individual. I mean, that might be very, very... The officer's responsibility was to secure that neighborhood. If there was really a burglary call, I might agree with you, but the 911 call is not a burglary call. It's just that there's a suspicious person in my neighborhood. It's a busybody neighbor who sees someone walking in the neighborhood that they don't know. They don't say... So it might have referred to Scott. It says a black female. He's a white male. It says a black female wearing a hat. I certainly think the same neighbor could call about any number of people they saw... Get a call saying black female, suspicious. White shows up, sees white male Scott. Scott doesn't want to talk to him. And approaches with him. But regardless, there was never a burglary call. So the answer to his question of what should have been done, because there was never a burglary call and no evidence of any burglary going on in the neighborhood, I don't think he has anything he needs to urgently attend to. But okay, I mean, maybe that's wrong. If there really is a burglary going on, maybe he could just walk away from Mr. Scott, because that's the other thing he could have done. There was nothing that Mr. Scott gave rise to to support that he had done anything wrong. No suspicion had been directed towards him. No suspicion had been called in about a crime. And he didn't give any evidence of having committed a crime in front of the officer. Just having prior convictions certainly isn't a crime. So even that question and... Well, wait, did he ask for prior convictions or prior arrests? Oh, gosh, he may have said just prior arrests. Yes. He said arrests. What I heard on the audio was he asked about... Prior arrests. Again, it's not a crime to have prior arrests in your record or to not answer that question. There was no reason to be asking that question. He certainly could have walked away, and so could the officer. Mr. Scott could have walked away because there was no reason for a detention. At that time, there was no detention, and so could the officer have simply walked away. Okay. And so we hope to get back to trial. I don't think there's any issue that merits reversal of Judge Pittman's opinion at this point. I think he was very clear in describing the issues of the injury, and he did note that little conflict that was raised by the city, but I think you're going to resolve that nicely in your order. Thanks, Judge. Thank you. Rebuttal. From the record, the object was not that small. It is the emblem that you find in the middle of a hubcap, so it's several inches in size, a metal object. The officer didn't know what it was. He simply knew it was a metal object of that size. He even describes the round, jagged edges from that metal object, but in no way is it as small as just represented. Do you have it? I mean, do you have it in evidence someplace? We do, Your Honor. We did, Your Honor. So we know how big it is. That's correct, and it is in the record. Is it round? It is round. And in diameter, how many inches is it? Several inches. I believe it was three inches, and if you can picture that as I can on my car, it has jagged edges, which is what makes it, when you push it onto the hubcap, that's what makes it stay on there. It snaps in. That's what the officer was seeing, and of course, to him, it's an unknown metal object. He did not know what it was, and he saw the shine off of it. With respect to the ground struggle, both barbs, it is in the record, did not enter Mr. Scott, and that's why he was never incapacitated. Only one barb entered, not both. As far as the evidence, plaintiffs submitted no evidence in this case. They submitted three exhibits, all three of which the district court properly excluded. They were generic articles about tasing in general. They didn't even submit an affidavit from Justin Scott, so they submitted no evidence for which the court could rely on. They did cite to Sergeant White's evidence, as they may. They cited to the video, but their citations were irrelevant. The district court identified two fact issues. They are irrelevant and unnecessary under Anderson. The plaintiff cited three fact issues, also irrelevant and unnecessary. The only thing the district court cited was at 1156, Justin Scott alleges he was standing on the sidewalk and not at the fence. In footnote six, he says there is a dispute if he was in the bamboo or with the suitcases. He then said, and with respect to that, no, this was not a call about a reasonable, a suspicious person in the neighborhood. The 911 call is in the record, and you can specifically hear them say, and it's also in the police report, there is a suspicious person hiding in the bamboo, leaning over the fence to my house. Now that is exactly the first thing you see on the video is not that. The first thing you see on the video, although it's rather grainy, is a black metal object alone on the sidewalk. At that point, Sergeant White passes and turns around. While he's doing that, you can see Mr. Scott come out of the bamboo and stand with the suitcase. There are many facts that went into that first encounter, Judge Higginson, that the district court just ignored. For example, Sergeant White says he's doing a seventh-inning stretch as I approach, which officers know is used to distract and to make a run for it when he flips his baseball cap on backwards, when he starts searching, patting down his own pockets. The district court ignored all of that, which was the totality of circumstances that formed the reasonableness of his decision. He is entitled to frisk a subject for his own safety. That's all he was setting out to do. Now, it suggested he could have taken him to the arch. To do that, you have to frisk someone before you put them in the patrol car. This was a split second decision that he made. He's not preparing to do anything other than frisk him. And it's admitted by the plaintiff is he was moving his arm while he was asking a question, and he did try to step away while Sergeant White suddenly had control of him. He did one thing, a forearm strike to the neck. There is no allegation of any neck injury. But frisk him for suspicion of what crime? Frisk him for weapons so that he could continue to safely question him. An officer is entitled to frisk for weapons to ask to safely question a subject. You analogized, I believe, Judge Higginson to Carol V. Ellington. And that's correct. This court found in 2006 that it was not excessive force when an officer used five to eight brachial stuns. This officer used one, which caused no injury. As your court said in that Carol case, the officer had no knowledge of any mental illness. There was no knowledge of that in this case either, nor is there any injury, physical injury or psychological injury from the first encounter with a single brachial stun. There is no psychological evidence of psychological injury being exacerbated. The only evidence is extensive psychological injury since childhood. We ask that you reverse and render judgment in favor of Sergeant White based on qualified immunity. There's no further questions. Thank you, counsel. Thank you.